RAVAL
TRIAL LAW

AMAR RAVAL | FOUNDER

amar@ravaltriallaw.com
(713) 324-8118

LICENSED IN TEXAS AND CALIFORNIA

November 18, 2025

**By Fax and Mail: (603) 334-0380**

Phyllis "M."
The Lincoln National Life Insurance Company
Disability and Life Claims
PO Box 2578
Omaha, NE 68103-2578

| | | |
|---|---|---|
| Re: | Insured: | Donna Polnac |
| | Policy Holder: | Memorial Hermann Health System |
| | Claim No.: | 14671333 |

Dear Ms. "M.":

As you know, we represent Ms. Donna Polnac in connection with her claim for Long Term Disability ("LTD") benefits under the referenced Lincoln National policy. Lincoln terminated her claim on or about June 27, 2025. This is her appeal.

Enclosed is the following additional evidence that establishes that Lincoln has wrongly terminated Ms. Polnac's claim:

**Additional Evidence**

1. Personal Statement – Donna Polnac
2. Personal Statement – James Polnac
3. Personal Statement – Cindy Fatheree
4. Personal Statement - Deanna Dyall
5. Personal Statement – Maeghan Murrell
6. American Medical Association Pain Assessment
7. ExamWorks Annual Earnings 2014
8. *Walker v. MetLife*, 585 F.Supp.2d 1167 (N.D. Cal. 2008)
9. Testimony of Wendell Potter
10. Photos of Ms. Polnac's swollen feet
11. Venous Study, October 23, 2025
12. Functional Capacity Examination, October 15, 2025
13. Genex History
14. Unum Completes Sale of Genex, Business Wire
15. Peter Madeja, Genex Profile
16. Peter Majeda, Genex CEO
17. Genex Case Management Services



**EXHIBIT 1**

18. Genex Loves Enlyte
19. *Kocar v. Hartford Life Ins Co. and Genex*, CV2021-006438, in AZ Sup. Ct., Maricopa County, April 20, 2021
20. Order Denying Genex Motion to Dismiss

The additional evidence is provided pursuant to Fifth Circuit case authority. Under *Vega*, Lincoln has an obligation to review this additional information. ("The administrative record consists of relevant information made available to the administrator prior to the . . . filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it".) *Vega v. National Life Ins. Services, Inc.*, 188 F.3d 287, 300 (5th Cir. 1999). *Vega* has been repeatedly upheld by the 5th Circuit, most recently in *Ariana M. v. Humana Health Plan of Texas, Inc.*, 884 F.3d 246 (5th Cir. 2018). Lincoln cannot ignore this additional evidence and keep it out of its claim file.

The additional evidence shows that Lincoln, in denying Ms. Polnac's claim, has ignored the disabling effects of her pain, long term effects of her many knee surgeries, relied exclusively on the opinions of biased and unqualified medical reviewers, ignored the medical evidence and opinions from Ms. Polnac's treating physicians, and ignored evidence from the Social Security Administration. The additional evidence provided demonstrates that Ms. Polnac is disabled under the terms of the Policy.

**Factual Summary**

Ms. Polnac has spent her life studying, working, and advancing in her career. After graduating high school in 1986, she took some college classes, only to stop and begin working. Soon after that, she got married and started a family. In 2000, she returned to college and graduated in 2002 with a Certificate in Surgical Technology. Ms. Polnac received a National Certification in Surgical Technology in November 2002 from the National Board of Surgical Technology and Surgical Assisting. She re-entered the workforce at a major trauma hospital in Houston. In time, she advanced to the title of Surgical Tech III, the highest level of Surgical Tech.

At various times, Ms. Polnac has worked 2 to 3 jobs at a time. She became a clinical instructor relating to Surgical Technology. Just before her disability, Ms. Polnac worked as a Surgical Technologist III in Labor and Delivery. This job requires a national certificate that must be renewed every 2 years. She just renewed my certification in February 2025 because she had every intention of returning to work.

Unfortunately, her body broke down. She has undergone 2 full knee replacements and at least 16 surgeries. As a result of the repeated surgeries, Ms. Polnac has chronic vein insufficiency in her legs. She now limps on her left side because of knee stiffness and pain which has caused pain in her right hip. She takes daily pain medication for knee pain and nerve pain.

Her life today is summarized as follows:



**EXHIBIT 1**

> I would love to go back to a job that I love and that provided me with a very good living. I would love to go back to the life I had before my knee pain started. I have tried every treatment offered to me, even if it was experimental. I wouldn't wish my daily and nightly pain on anyone. I would love to be able to sleep through the night without being woken up by pain. I would love to not have to sleep on my back with my leg elevated. I would love to not have to plan out my every move. I would love to have the kind of intimacy and closeness I had with my husband.
>
> I cannot safely live the life that I would like to. I cannot safely, mentally and physically, return to work. My disability is a liability to my patients, my co-workers, the doctors I assist and the organization that I work for.

*Exhibit 1.*

Her family and friends provide similar evidence. *Exhibits 2-5.*

**Disabling Effects of Pain**

Severe pain can be so disabling that it can prevent a person from performing any occupation. *Morris v. CitiBank, N.A. Disability Plan (501)*, 308 F.3d 880, 882-885 (8th Cir. 2002). Medical science confirms that "pain can be severe and disabling even in the absence of 'objective' medical findings, that is, test results that demonstrate a physical condition that normally causes pain of the severity claimed by the applicant". *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004).

The American Medical Association issued an interactive Continuing Medical Education seminar on pain in November 2007 that is of relevance to this claim, including the following points:

1. Pain is a "combined sensory, emotional, and cognitive phenomenon and that physical pathology does not need to be present for a patient to experience pain."

2. Pain management depends on a comprehensive assessment, which includes past medical history, a physical examination, an assessment of psycho-social, family, and cultural aspects, and a pain assessment, including pain history and previous treatment that has helped the patient's pain.

3. Pain is "inherently subjective and the patient self-report is the gold standard in assessment."

4. The failure to treat pain adequately is a serious health issue that can begin to be addressed with improved knowledge and practice of pain assessment and management, reiterating that the most reliable indicator of pain is the

> self report by the patient.
>
> 5. "Chronic or persistent pain is best conceptualized as an illness in its own right".
>
> *Exhibit 6.*

Ms. Polnac has provided a plethora of evidence that demonstrates her regular and persistent pain. *Exhibits 1-5, 10*. Her physicians have also diagnosed her with chronic pain disorder. *Claim File, p. 300*.

A person who cannot walk, stand, or sit for over 1 hour without pain does not have the capacity to do most jobs available in the national economy. *Delgado v. Heckler*, 722 F.2d 570, 574 (9th Cir. 1983). An administrator may abuse its discretion if it ignores a claimant's subjective complaints of pain. *Audino v. Raytheon Co. STD Plan*, 129 Fed. App'x 885 (5th Cir. 2005). Ms. Polnac suffers from unbearable pain, and she cannot sit, stand, or walk for even 1 hour without pain. *Exhibits 1-5, 12*. The pain she suffers, by itself, is sufficient to support her LTD claim.

## Lincoln's Social Media Investigation Supports Disability

In denying this claim, Lincoln relied heavily on a social media investigation carried out by CoventBridge. It is unclear how much Lincoln paid CoventBridge, as it hid that information from the claim file. The investigation was spurred by Ms. Polnac's comments on a claim form that she can sit for 1 hr/day, stand for 2 hrs, walk 30 minutes, and go on cruises 1-2 times a year. *Claim File, pp. 957-968*. CoventBridge completed an Investigative Report" that reviewed her social media activity. Here is what it showed:

> A Facebook account was located using the claimant's name, relatives, and the client provided link. The about section states that the claimant is a certified surgical technologist at a hospital in labor and delivery. The about section also states that the claimant studied at San Jacinto College, and went to Deer Park. The latest upload was shared on April 26, 2025. The claimant frequently shares viral content to their page. On March 21 and March 16, 2025, the claimant was selling tickets. On February 7, 2025, the claimant shared that it has been eleven days since surgery they had on their knee. The claimant shares photos of their knee and states that they have experienced swelling. They also shared that they have been going to physical therapy. On January 27, 2025, the claimant shared a photo of them getting ready for their knee surgery. On January 24, 2025, the claimant shared that they went on a cruise. On August 26, 2024, the claimant shared a photo of their knee. In the comments, the claimant shared that they had another knee surgery and are trying to reduce scar tissue. On August 17, 2024, the claimant shared photos of them attending a ball game and other activities while stating they had an upcoming knee surgery. On June 1, 2024, the claimant shared photos of their knee. The claimant also shared that they are wanting to go back to work; however, most of their time is dedicated towards their knee. The claimant shared that they were on their eighth knee procedure. On April 7, 2024, the claimant shared photos of a baseball game. April 6, 2024, the claimant shared photos of them at a baseball game while also sharing photos of their knee. On March 30, 2024, the claimant shared photos of both of their knees. Both knees appear to have scars from surgery. On January 26, 2024, the claimant shared that they went on a cruise. The claimant is seen using a cane. On December 3, 2023, the claimant shared more content, about their knee. At this time, the claimant shared they were on their sixth procedure. On July 29, 2023, the claimant shared that they underwent their fifth procedure. On June 2, 2023, the claimant shared a photo of them at a baseball game with scars on their left knee. On August 3, 2022, the claimant shared a photo showing both knees. In the photo, only their right knee has surgical scaring. On November 7, 2021, the claimant shared a photo showing both knees having stiches. On October 29, 2021, the claimant shared a photo of them after they had surgery. In the photos, both knees are wrapped, and the claimant is walking with a walker.



**EXHIBIT 1**

*Claim File, p. 995.*

Her Facebook activity revealed the following activity:

Donna Weldon Polnac
April 14 at 7:25 PM ·

Having a handicap license pass displayed on my mirror I parked and got out of the car, I had this lady say to me, "well, you look perfectly normal to me!", as I turned to look at her and said, very seriously, "maybe that's part of the problem, you can't see what's lurking under my shell." The look on her face was priceless! Just because YOU can't SEE it doesn't mean it doesn't exist! Until you have walked in our shoes and have felt the pain we feel, keep your cruel and ignorant comments and opinions to yourself. I'm posting to stop people from mocking and laughing at people for things beyond their control...

---

Donna Weldon Polnac
February 7 ·

11 days post-op. It was nice to get out of the house today even if it was for physical therapy and a post-op appointment. I got the wound vac taken off and will go back next week for suture removal. I do have extra swelling but I just need to elevate my leg higher and keep icing.





EXHIBIT 1


This photo is from a post.
View post
Donna Weldon Polnac
February 7
Friday, February 7, 2025 at 3:46 PM
Write a comment...


This photo is from a post.
View post
Donna Weldon Polnac
February 7
Friday, February 7, 2025 at 3:46 PM
Write a comment...



**EXHIBIT 1**




The activity showed a disabled person sharing her personal journey. Perhaps Lincoln was excited to see photos of Ms. Polnac at an Astros game in April 2024, hoping that it somehow demonstrated her ability to work full-time. Here are those photos:






EXHIBIT 1




The Policy does not prohibit an insured from being a fan of the two-time World Series Champion Houston Astros, surgical scars and all. In short, the CoventBridge investigation only provided additional evidence that Ms. Polnac is disabled. Lincoln's perverted interpretation shows its single-pointed desire to deny her claim, no matter what the evidence.

## Lincoln Ignores Whole Person Analysis

Another flaw in Lincoln's review of this claim comes from its failure to assess Ms. Polnac's condition, medically and vocationally. This is a violation of well settled law. Federal courts have ruled that denying disability benefits without considering the combination of impairments a claimant faces due to multiple medical conditions is an abuse of an insurer's discretion.

In *DuPerry*, the court affirmed a judgment against LICNA awarding both "own occupation" and "any occupation" benefits. The court criticized LICNA's failure to consider the combined effects of Duperry's multiple medical problems.

> The existence of objective evidence that DuPerry suffered from rheumatoid arthritis, osteoarthritis, and fibromyalgia is not disputed. That a person with these diseases would suffer significant pain and fatigue is also well established. DuPerry's subjective complaints served only to pinpoint the precise intensity of her symptoms and her inability to endure them over the course of a workweek. In the absence of any significant basis for rejecting the account of DuPerry and her treating physicians and in light of the structural conflict of interest that LINA faced as the result of its dual role as administrator and insurer, LINA's denial of benefits constituted an abuse of

discretion.

Lincoln has repeated the same misconduct here. See *Johnson v. Metropolitan Life Ins. Co.*, Case no. 1:06-CV-2851-CAP (N.D.Ga., May 30, 2008) (combination of several impairments clearly disabling, and MetLife's reviewers gave opinions based upon an "isolated view" rather than the "big picture"); *Huberty v. Standard Ins.Co.*, 2008 U.S.Dist.LEXIS 27139 (D.Minn. March 25, 2008)("No one working for Standard considered whether the combined effects of Huberty's different maladies disabled him."); *Stephan v. Provident Life and Acc. Ins. Co.*, 211 F.Supp. 645 (D. Md. 2002) (Provident criticized for failing to consider all of an employee's medical evidence and failing to consider illnesses in connection with each other).

The combined effects of Mc. Polnac's knee replacements and knee revision surgeries have left her totally disabled. Lincoln has abused its discretion in ignoring this evidence. Why would it do so? The answer, as always, is to follow the money trail.

**Lincoln's Incentive to Deny Claims**

Lincoln is an insurance company operating as part of the Memorial Hermann Benefits Plan. In this role, Lincoln's role is to deliver on the promise of its disability insurance policy within the confines of ERISA and applicable regulations. It must fully, fairly, and objectively investigate, evaluate, adjust, and pay or deny claims in good faith.

However, Lincoln operates under a structural conflict of interest inherent in its dual role as insurer and Claims Administrator. Not only is it the insurer of Ms. Polnac's claim responsible for the payment of benefits, but its failure to pay this claim inures directly to its financial benefit. Lincoln is motivated to deny this claim to obtain financial gain at the expense of Ms. Polnac and other similarly situated claimants. Its motivation is financial, instead of an honest, objective adjustment of the claim in line with its fiduciary obligations. That financial gain is and has been obtained in various ways.

Lincoln reserves funds for pending claims. It reserved funds for Ms. Polnac's claim after she filed her claim. Those reserved funds are not idle but are instead invested together with other funds available to Lincoln to generate significant revenue. Recognizing the likely long delay before a claim is resolved, Lincoln enjoys the financial gain of the investment income and financial return as an additional source of revenue and profits. This is another example of its financial conflict of interest.

But Lincoln makes it even worse by providing claims personnel, including those in claims management and those involved in deciding whether to accept or deny claims like the one filed by Ms. Polnac, with monetary incentives to delay payment or deny disability claims. Lincoln employees get bonuses based on specific metrics contained in their semiannual and annual reviews. Some of them also get stock bonuses. In short, Lincoln incentivizes its employees to delay and deny claims at the expense of claimants like Ms. Polnac. Wendell Potter has previously testified before the U.S. Senate about the financial motives that drive insurers like Lincoln to deny claims. *Exhibit 9*. If necessary, we will seek additional evidence of Lincoln's structural conflict of interest in this litigation.



**EXHIBIT 1**

## Bias of Genex

In denying Ms. Polnac's claim, Lincoln hired Genex Services, Inc., who paid Dr. George Kum-Nji to review some medical records. Genex is well known for its business model: offer medical record reviewers to insurance companies so that they can review selected medical records and opine on the viability of open disability claims.

Although Lincoln refers to the Genex physicians from whom it purchases opinions as "independent," that is hardly the case. From 1997-2007, Genex was owned by Unum/Provident Unum, the largest long-term disability insurer in the country. *Exhibit 13*. That was a notable period for Unum/Provident, as "[a]uthoritative evidence" showed that "from the mid-1990s into the present decade" it engaged in a deliberate program of bad faith denial of meritorious [disability] benefit claims." Langbein, John H., "Trust Law as Regulatory Law: The Unum/Provident Scandal and Judicial Review of Benefit Denials under ERISA," 101 Nw. U. L. Rev. 1315 (2007). Unum/Provident's disability claims practices became the subject of extensive investigation, summarized in the Targeted Multi-state Market Conduct Examination dated November 18, 2004. Among the concerns identified in that Examination were Unum's failure to evaluate the *totality* of claimants' medical conditions, and placing inappropriate burdens on claimants to justify eligibility for benefits. The lead examining states designed a plan of corrective action which included a $15M fine and the establishment of a claim reassessment process.

Genex formally detached itself from Unum in 2007 but remains linked in spirit. Its CEO, Peter Madeja, was once the Executive Vice President of Unum/Provident during 2003-2007. *Exhibits 13-15*. Genex overtly serves the disability insurance industry from which it sprung. Its promotional materials urge that it provides "a full range of . . . services to help you effectively manage your disability claims to optimal outcomes," *Exhibit 16*; and that its "services have been proven to improve return to work by more than 35% over national benchmarks."[1]

Its "reputation for disability case management is based on a high level of knowledge and expertise that helps companies reduce claims liability and contain disability costs." *Exhibit 17*. Genex touts that it "know[s] which conditions will benefit from traditional case management, which may need more intense services, and which require only targeted task intervention." *Exhibit 17*. None of this sounds like "independence"; on the contrary, Genex acts to further the interests of disability insurers in their effort to "reduce claims liability and contain disability costs." *Id.*

Genex is now part of Enlyte, formed in 2022 to serve the insurance industry. "Enlyte is Mitchell, Genex and Coventry, a family of businesses with one shared vision. We bring together the best of the Property and Casualty industry in a single, powerful organization connected by one overarching goal: transforming your performance now, so you can chart a course to a better future." *Exhibit 18*. Lincoln cannot credibly claim that Enlyte is

---

[1] https://www.genexservices.com/adjuster-tools



EXHIBIT 1

"independent" of the insurance industry it serves.

These are not just our conclusions. A lawsuit in Arizona accused Genex of the following conduct:

- "Defendant Genex aided and abetted Hartford's bad faith by serving as a disingenuous "independent" intermediary between Hartford and Defendant McCrary, which allowed Hartford to feign innocence and impartiality in the selection of Defendant McCrary for IMEs."
- "Defendant Genex knows it is providing biased IMEs and facilitating institutional bad faith practices in working for Hartford."
- "Genex offers its customers, including Hartford, an "IME dashboard" where Genex provides key metrics."
- "Genex provides that 'another key piece … built into this dashboard is a view into the actual providers themselves. So, you can see information about the actual doctors that are performing the IMEs. You can see information about the volume that is going to them. What is their turnaround time? What is their percentages and no-shows? And costs associated with those docs as well. So, it gives you a good insight on which doctors you would want to use in going forward in your IME program.'"
- "When scheduling IMEs for clients, including Hartford, Defendant Genex promises that cases will be 'handled by only [the] highest-performing physicians who deliver the best outcomes.'"
- "Defendant Genex explains in its marketing materials that the benefits of utilizing IMEs during claims management outweigh the costs, because IMEs can be used to deny claims."
- "Genex admits that a quality IME should assist in claim closure."
- "Plaintiff is informed and believes Hartford makes decisions on IMEs based on Genex's analytics, as well as its own internal analytics."
- "Hartford has employees from its 'Claims Solutions and Analytics' Department included on emails with Genex when scheduling IMEs with Defendant McCrary."
- "Plaintiff is informed and believes that Hartford intentionally selects Defendant McCrary, or expects Genex to select Defendant McCrary, because it knows statistically that Defendant McCrary will support the cessation of insureds' disability benefits."

  *Exhibit 19.*

Genex moved to dismiss the Complaint. The Court denied the motion, finding that:

> As to knowledge and substantial assistance, the Plaintiff claims that… Defendant Genex provided Hartford with biased IMEs with the knowledge or understanding that the purpose of doing so was to help Defendant Hartford close out claims… According to Plaintiff, a general awareness is sufficient; complete knowledge of the tort is not required…The Plaintiff here has specifically alleged that Defendant Genex had knowledge of what it was doing and that it advertised to its clients that it could assist with closing out claims. While the Defendant argues that this is merely inference upon inference, it is unclear to the Court what other allegations would be necessary to support a claim of aiding and abetting bad faith without discovery taking place.
>
> *Exhibit 20.*

More evidence of this bias exists, and we will provide it in litigation, if necessary.

## Bias of Medical Record Reviewers

In this claim, Lincoln paid for the opinions of two medical record reviewers, Dr. George Kum-Nji and Dr. Bruce Myers. It only seems to have relied on Dr. George Kum-Nji. Dr. Kum-Nji is not licensed to practice medicine in Texas. He does appear to practice as a physiatrist in Louisiana. Given his relative proximity to Texas, it is unclear why Lincoln National refused to have Dr. Kum-Nji physically examine Ms. Polnac. After all, the Policy gives Lincoln National the right to do so:

**Examination**

Liberty, at its own expense, may have the right and opportunity to have a Covered Person, whose Injury or Sickness is the basis of a claim, examined or evaluated at reasonable intervals deemed necessary by Liberty. This right may be used as often as reasonably required.

*Policy p. 57.*

On Instagram, Dr. Kum-Nji explains the importance of in-person assessments to treat hip pain like Ms. Polnac's:




https://www.instagram.com/p/CDN6XMhACjO/

There is no evidence that he has experience with knee replacements or treatment for knee pain. He focuses on spinal cord stimulators.

With these parameters, it is mind boggling that Dr. Kum-Nji could opine that Ms. Polnac had no physical restrictions and limitations from April 1 – September 13, 2025 when his report was completed on June 15, 2025. Does Dr. Kum-Nji contend that he can see *three months* into the future? In his haste to befriend Genex and Lincoln, he compromised his credibility: since he already decided that she cannot be disabled through September 2025, then he would not review *Exhibits 1-5* and *10-12*. A more objective opinion is needed.

However, his report relied heavily on the surveillance. There is no evidence that Dr. Kum-Nji reviewed any surveillance video or surveillance report. If anything, he was spoon-fed a summary by Lincoln and copied and pasted it into his report. His opinions on surveillance are undercut by the evidence provided by Ms. Polnac. *Exhibits 1-5*.

Lincoln also paid for a medical review by Dr. Bruce Myers. Based on his review, Dr. Meyers concluded as follows:

**Taking into consideration the entire clinical picture, including evidence based medicine and any medication or other treatment side effects, please describe how any supported level of impairment translates into restrictions and limitations from 1/1/2024 to present, and comment on the expected duration.**
Sit – not more than one hour at a time and 4 hours in a workday.
Stand – not more than one hour at a time and 4 hours in a workday.
Walk – not more than 30 minutes at one time in 2 hours in a workday.



**EXHIBIT 1**

*Claim File, p. 1115.*

This evidence, standing alone, proves that Ms. Polnac cannot do sedentary work and remains disabled. A person who cannot walk, stand, or sit for over 1 hour without pain does not have the capacity to do most jobs available in the national economy. *Delgado v. Heckler*, 722 F.2d 570, 574 (9th Cir. 1983). Although Dr. Myers expected improvement within one year, the October 15, 2025 FCE shows that Ms. Polnac still has less than sedentary ability. *Exhibit 10.*

Going further, Dr. Myers opined that "It is less than likely that the claimant will return to her pre-injury status". *Claim File, p. 1116.* Given that Lincoln's paid reviewer supported Ms. Polnac's disability claim, it had no basis to ignore those findings. But that's not all that Lincoln ignored in this clam.

## Ms. Polnac's Physicians Are Well Qualified

If this case reaches litigation, the Court will not defer to Lincoln's medical reviewers. The standard of review will be de novo. *Ariana M. v. Humana Health Plan of Texas, Inc.*, 884 F.3d 246 (5th Cir. 2018). It will be important for the Court to evaluate the credibility of Lincoln's paid medical reviews against Ms. Polnac's physicians.

Dr. Timothy Brown is an orthopedic surgeon board certified by the American Board of Orthopaedic Surgery. After graduating from University of Texas Southwestern Medical School, he did a fellowship at the Mayo Clinic focusing on hip and knee reconstruction.[2] Unlike Dr. Kum and Ms. Pettite, he sees and treats patients.

Dr. Brown has regularly seen and examined Ms. Polnac. He has diagnosed her with arthritis and chronic pain disorder. He performed surgery on her in January 2025. *Claim File, p. 303.* Given her history of previous knee surgeries and delayed wound healing, along with the combined effect of knee replacements that had to be revised multiple times, it is reasonable that he would find her disabled. He set a follow up in January 2026 to reevaluate her knee. *Claim File, p. 316.*

Lincoln has no one whose credentials or qualifications match Dr. Brown. It should carefully evaluate his opinions and discard the rancid, unqualified, and biased opinions of Dr. Kum-Nji.

## Social Security Disability is Probative of Disability

The Lincoln Policy requires Ms. Polnac to file a Social Security Disability Income benefit claim (SSDI). If she is approved, Lincoln is allowed to offset the benefits it owes under the ERISA policy. Given that Ms. Polnac was found disabled by the Social Security Administration, how much weight should Lincoln give to that finding of disability?

In *Darland v. Fortis Benefits Insurance Company,* 317 F.3d 516 (6th Cir. 2003), the Court

[2] https://www.houstonmethodist.org/doctor/tim-s-brown/

of Appeals found that Fortis' decision to deny benefits was arbitrary and capricious. The court noted that a favorable Social Security decision is evidence that an insurance company acted arbitrarily and capriciously by requiring a claimant to apply for Social Security, then ignored the favorable Social Security decision. The Court explained:

> Fortis requested that Darland apply for Social Security disability benefits so as to reduce the amount of monthly disability payments that it paid Darland under the plan. Although Fortis claims that the statutory criteria and factors considered by the Social Security Administration may be markedly different from the criteria and factors considered by an insurer in determining whether a claimant is disabled, it is plainly evident that the Social Security standard for a disability determination is much more stringent than that required by Fortis' insurance policy.[footnote omitted] Moreover, after the Social Security Administration determined on July 8, 1998 that Darland was totally disabled as of July 15, 1996, Fortis then requested that Darland reimburse it for overpayment of insurance benefits, even though Fortis terminated payment of disability benefits to him under its policy on August 16, 1998. As in *Ladd* [*v. ITT Corp.,* 148 F.3d 753, 755-56 (7th Cir.1998)], it is totally inconsistent for Fortis to request that Darland apply for Social Security disability benefits, yet avail itself of that Social Security determination regarding disability to contend, at the same time, that he is not disabled. *Ladd,* 148 F.3d at 753. Though not directly applicable in this case, the principles of judicial estoppel certainly weigh against Fortis taking such inconsistent positions.

The issue arose again in *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286 (6th Cir., 2005), where the Court chastised Liberty Life (Lincoln's predecessor) for disregarding the SSDI finding:

> This is not to say, however, as Liberty argues, that the SSA determination is meaningless and should be entirely disregarded. While it is true that the SSA must apply the "treating physician rule" in its determinations, that rule provides that deference is to be given to the opinions of treating physicians (over those of non-treating or reviewing physicians) where, *and only where,* there is objective support for those opinions in the record. *See Cutlip v. Secretary of H.H.S.,* 25 F.3d 284, 286-87 (6th Cir.1994); *Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir.1985). Hence, the SSA determination, though certainly not binding, is far from meaningless. As the Court said in *Black & Decker,* a plan administrator may not arbitrarily disregard the medical evidence proffered by the claimant, including the opinions of her treating physicians. 538 U.S. at 834, 123 S.Ct. 1965. Here, the SSA determination, at a minimum, provides support for the conclusion that an administrative agency charged with examining Calvert's medical records found, as it expressly said it did, objective support for Dr. Hester's opinion in those records.

Thus, while a Social Security decision is not automatically binding, insurance companies



EXHIBIT 1

may not ignore favorable Social Security Decisions that are in the record. However, the court went further. When the insurance company requires the claimant to apply for Social Security benefits for the purpose of reducing the amount of benefits it must pay, a court should take that into account, when considering the record as a whole, as a factor in determining if the administrator's decision to deny benefits was arbitrary and capricious.

To sum up, insurance companies must obey the following principles:

1. An ERISA decision-maker is not free to ignore the decision of the Social Security Administration, and the fact that a person has been found disabled by that Agency is a factor the Court should consider, in the context of the record as a whole. *Calvert*, 409 F.3d at 295.
2. When a court is determining just how much weight should be given to the Social Security decision, a court should apply increasing amounts of skepticism to the plan administrator's decision making, depending on such factors as whether the plan required the claimant to apply for Social Security, whether the administrator expressly required a claimant to apply for Social Security, whether the administrator benefited financially from the favorable Social Security decision, and, as occurs in some cases, whether the administrator took an active role in assisting the claimant in applying for Social Security.
3. When an insurance company ignores the SSDI finding, it is a "significant factor" to be considered by the Court. *Glenn v. MetLife*, 461 F.3d 660, 666-669 (6th Cir. 2006).

Here, Lincoln has abused its discretion and violated these principles. It is not sufficient to cut and paste generic language in a denial letter like this:

> In our review of your claim, The Lincoln National Life Insurance Company has fully considered the Social Security Administration's ruling to approve Social Security Disability benefits. It should be noted, however, that while we have fully considered the Social Security Administration's ruling, the decision by the Social Security Administration does not determine entitlement to benefits under the terms and conditions of Memorial Hermann Health System's Policy. Moreover, The Lincoln National Life Insurance Company has obtained and considered any that were not considered by the Social Security Administration in its determination process.

This only raises more questions. Did Lincoln obtain the complete SSA claim file? Did it get the evidence that the SSA relied on in approving the SSDI claim? Did it obtain any physical examination reports? Finally, what evidence did Lincoln consider that the SSA did not? Lies and misrepresentations do not make for full and fair review.

## Functional Capacity Examination

On October 15, 2025, Ms. Polnac underwent a Functional Capacity Examination with Dr. Stephanie Cohen for objective evidence of her current physical demand level. It demonstrates the following:

> Overall, the examinee demonstrated the ability to safely and dependably perform at a ***Less than Sedentary Physical Demand Level***, and has difficulty performing normal activities of daily living due to moderate to severe pain in the left knee, right knee pain, right lateral thigh pain, giving away of the left knee, and inability to bend the knees enough to perform any bending, squatting, or lifting from knee or floor level. The examinee is unable to sit or stand for prolonged periods, which make her unable to perform at an even Sedentary Physical Demand Level. The examinee is unable to perform at an even Sedentary Physical Demand Level as defined by the Department of Labor, which includes sitting most of the time, and standing/working up to 1/3 of an 8-hour work period. Therefore, the examinee is unable to work at any capacity at this time. The examinee is unable to stand or work for up to 1/3 of a work period due to increased pain, instability in the bilateral knees, but especially the left knee, and buckling and giving away of the left knee. The examinee is unable to sit for prolonged periods of time to perform an even Sedentary Job as she has increased left knee pain, and vascular insufficiencies in the lower extremities, which she is currently seeing a vascular specialist for. The examinee must elevate her legs due and is unable to sit, stand, or walk for prolonged periods of time. Therefore, the examinee is unable to work in any capacity at this time and is unable to meet the minimum requirements of her job as a Surgical Technician III for Memorial Hermann.

*Exhibit 10*.

Unlike Dr. Cum or Ms. Pettito, Dr. Cohen saw Ms. Polnac in person, examined her, and had a chance to fully review her physical restrictions and limitations. **Because she has less than sedentary physical ability, the FCE conclusively proves that she cannot work in any other occupation**.

## Witness Statements

In addition to the overwhelming medical evidence supporting the finding of disability for Ms. Polnac, we previously provided personal statements from her, her family, and her friends. *Exhibits 1-5*. These personal statements set forth detailed observations of the tremendous debilitating effects of her disability on her ability to function in both her personal and professional life.

For Lincoln to deny Ms. Polnac's appeal, it will have to decide that Ms. Polnac, her family, her friends, and her medical providers are conspiring to commit insurance fraud. The truth is far simpler: Ms. Polnac is disabled, and Lincoln National has ignored the evidence supporting her claim. In her own words:

Donna Weldon Polnac
June 1, 2024 ·

I've been trying to decide if I should post my opinion or not but here I go...
People on long term disability are not on vacation, mothers on maternity leave are not on vacation.. I get asked what do you do all day since you are on disability? My job is trying to recover. . I spend 3-6 hours on a continuous motion machine? I spend an hour at physical therapy, I spend time every day doing ice and heat therapy.. I would much rather be at work! I'm worrying about if my knee will bend enough to get in someone's car, on an airplane, in a stadium seat or even having to seek out a handicap bathroom. It is not a vacation. I'm on my 8th knee procedure.



**Conclusion**

Lincoln must review the enclosed evidence and promptly approve Ms. Polnac's claim. We look forward to your prompt response.

Very truly yours,

**RAVAL TRIAL LAW**

By: *Amar Raval*
Amar Raval

AR:

USB Enclosure
c: Ms. Donna Polnac



EXHIBIT 1