IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DONNA POLNAC | § | |
| | § | |
| V. | § | C.A. No. 4:26-cv-00668 |
| | § | |
| THE LINCOLN NATIONAL LIFE INSURANCE COMPANY | § § | |

**Plaintiff's Original Complaint**

DONNA POLNAC files this lawsuit against The Lincoln National Life Insurance Company due to its wrongful termination of her long-term disability claim. Lincoln failed to timely decide her appeal before this lawsuit was filed. It is thus deemed denied, entitling her to bring this matter.

**Parties**

1. Plaintiff, Donna Polnac ("Polnac") is a resident citizen of Katy, Texas.

2. Defendant, The Lincoln National Life Insurance Company ("Lincoln"), is a domestic or foreign insurance company doing business in various states including the State of Texas. Lincoln has not yet answered or appeared in this lawsuit.

**Jurisdiction and Venue**

3. This action against Lincoln arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 *et seq*. This Court has jurisdiction over this action pursuant to 29 U.S.C. §1132(e)(1).

4. Venue is proper in this District and Division pursuant to 29 U.S.C. §1132(e)(2) because Lincoln maintains business activity in and may be found in this district.

5. Pursuant to 29 U.S.C. §1132(h), this Complaint has been served upon the Secretary of Labor, Pension and Welfare Benefits Administration, at 200 Constitution Avenue N.W., Washington, D.C. 20210 and the Secretary of the Treasury at 111 Constitution Avenue N.W., Washington, D.C. 20024, by certified mail return receipt requested.

**Factual Summary**

6. Lincoln is in the insurance business and sells various forms of life insurance, long term care insurance, and disability insurance. The promise of disability insurance is to provided income protection if an insured is disabled by injury or sickness.

7. Implicit in the promise of Lincoln's policy is that it will timely, fairly, and objectively adjust and pay a covered claim. If in doubt about the cause or nature of the insured's disability, Lincoln implicitly promises to investigate the claim fairly and objectively and promptly pay if the claim meets the policy requirements.

8. Ms. Polnac has spent her life studying, working, and advancing in her career. After graduating high school in 1986, she took some college classes, only to stop and begin working. Soon after that, she got married and started a family. In 2000, she returned to college and graduated in 2002 with a Certificate in Surgical Technology. Ms. Polnac received a National Certification in Surgical Technology in November 2002 from the National Board of Surgical Technology and Surgical Assisting. She re-entered the workforce at a major trauma hospital in Houston. In time, she advanced to Surgical Tech III, the highest level of Surgical Tech.

9. Before her disability, Ms. Polnac worked as a Surgical Technologist III in Labor and Delivery. This job requires a national certificate that must be renewed every 2

years. She renewed her certification in February 2025 because she wanted to return to work

10. Unfortunately, her body broke down. She has undergone 2 full knee replacements and at least 16 surgeries. As a result of the repeated surgeries, Ms. Polnac has chronic vein insufficiency in her legs. She now limps on her left side because of knee stiffness and pain which has caused pain in her right hip. She takes daily pain medication for knee pain and nerve pain.

11. As a full-time employee at Memorial Hermann, Ms. Polnac enrolled in the Memorial Hermann Health System Plan ("Plan") that included benefits for long term disability (LTD). The Plan was part of Memorial Hermann's Group Insurance Policy issued and administered by Lincoln. It provided income protection if an employee was disabled because of injury or sickness. Ms. Polnac was an eligible employee.

12. Lincoln was the Insurer of the Plan.

Ms. Polnac's Disability

13. Ms. Polnac chose to work as a Surgical Tech because she enjoyed helping patients bring babies into the world. It brought her joy to participate in life-changing events for those families and be part of the next phase of their journey.

14. But her health began to deteriorate. In 2021, Ms. Polnac began complaining about her knees. She would spend 12+ hours a day working as a Surgical Tech with little or no rest while at work. Her outside work activities were affected.

15. She contacted knee specialists for her knees, and surgical options became the best choice to return to previous activity level with lessened pain.

16. Ms. Polnac underwent a right knee replacement in March 2022. She had a total left knee replacement in March 2023.

17. She stopped working on March 16, 2023.

18. Two more knee manipulation surgeries followed in May and June 2023.

19. Ms. Polnac underwent another left knee surgery in March 2024.

20. She underwent left knee replacement revision surgery in January 2025 that removed the previous knee implant and all associated hardware.

21. As of today, Ms. Polnac has had at least 16 knee surgeries on her left knee. Her right knee has never returned to 100% mobility.

22. Despite her many surgeries, Ms. Polnac's left knee has caused her extensive limitations. She has trouble walking, standing, climbing stairs, sitting, getting into a vehicle, and other activities of daily living.

23. Despite trying to return to work for a short time, Ms. Polnac has not substantially worked since March 2023.

24. As of February 6, 2026, Lincoln agrees that Ms. Polnac cannot work in her old occupation.

The LTD Claim

25. Ms. Polnac applied for LTD benefits in September 2023.

26. On August 30, 2022, Lincoln employee Tamara Hite performed an occupational analysis of Ms. Polnac's job. She determined that Surgical Tech was light duty work in the national economy.

27. Lincoln approved her LTD claim on October 18, 2023.

28. On May 13, 2024, a Dr. Bruce Meyers reviewed some of Ms. Polnac's medical records. He concluded that "it is less than likely that she will return to her pre-injury status".

29. In April 2025, Ms. Polnac sent updated claim forms to Lincoln. She explained sher was only able to sit for 1 hour per day, stand for 2 hours per day, and walk for 30 minutes per day. She also explained that she went on 1-2 cruises per year.

30. On May 6, 2025, Lincoln employe Fallon Matthews had a phone call with Ms. Polnac. Ms. Polnac explained that, in a typical day, she would do little things in the kitchen, take breaks throughout the day, and do light laundry. She had someone else clean her house ever since her knee problems started.

31. In May 2025, Lincoln hired a company named CoventBridge Group to perform an investigative report. The activity was spurred by Ms. Polnac's report of her limitations in her April 2025 claim forms.

32. CoventBridge completed an Investigative Report" that reviewed her social media activity. Here is what it showed:

A Facebook account was located using the claimant's name, relatives, and the client provided link. The about section states that the claimant is a certified surgical technologist at a hospital in labor and delivery. The about section also states that the claimant studied at San Jacinto College, and went to Deer Park. The latest upload was shared on April 26, 2025. The claimant frequently shares viral content to their page. On March 21 and March 16, 2025, the claimant was selling tickets. On February 7, 2025, the claimant shared that it has been eleven days since surgery they had on their knee. The claimant shares photos of their knee and states that they have experienced swelling. They also shared that they have been going to physical therapy. On January 27, 2025, the claimant shared a photo of them getting ready for their knee surgery. On January 24, 2025, the claimant shared that they went on a cruise. On August 26, 2024, the claimant shared a photo of their knee. In the comments, the claimant shared that they had another knee surgery and are trying to reduce scar tissue. On August 17, 2024, the claimant shared photos of them attending a ball game and other activities while stating they had an upcoming knee surgery. On June 1, 2024, the claimant shared photos of their knee. The claimant also shared that they are wanting to go back to work; however, most of their time is dedicated towards their knee. The claimant shared that they were on their eighth knee procedure. On April 7, 2024, the claimant shared photos of a baseball game. April 6, 2024, the claimant shared photos of them at a baseball game while also sharing photos of their knee. On March 30, 2024, the claimant shared photos of both of their knees. Both knees appear to have scars from surgery. On January 26, 2024, the claimant shared that they went on a cruise. The claimant is seen using a cane. On December 3, 2023, the claimant shared more content, about their knee. At this time, the claimant shared they were on their sixth procedure. On July 29, 2023, the claimant shared that they underwent their fifth procedure. On June 2, 2023, the claimant shared a photo of them at a baseball game with scars on their left knee. On August 3, 2022, the claimant shared a photo showing both knees. In the photo, only their right knee has surgical scaring. On November 7, 2021, the claimant shared a photo showing both knees having stiches. On October 29, 2021, the claimant shared a photo of them after they had surgery. In the photos, both knees are wrapped, and the claimant is walking with a walker.

33. Her Facebook activity revealed the following activity:



Donna Weldon Polnac
April 14 at 7:25 PM ·

Having a handicap license pass displayed on my mirror I parked and got out of the car, I had this lady say to me, "well, you look perfectly normal to me!", as I turned to look at her and said, very seriously, "maybe that's part of the problem, you can't see what's lurking under my shell." The look on her face was priceless! Just because YOU can't SEE it doesn't mean it doesn't exist! Until you have walked in our shoes and have felt the pain we feel, keep your cruel and ignorant comments and opinions to yourself. I'm posting to stop people from mocking and laughing at people for things beyond their control...


This photo is from a post.
View post
Donna Weldon Polnac
February 7 ·
Friday, February 7, 2025 at 3:46 PM
1
Write a comment...


Donna Weldon Polnac
January 27 ·
Here we go again... another knee surgery. Please say a prayer that recovery will be quick and that this surgery will be the last one that I need. Thanks in advance for the prayers. 🙏❤️🙏

34. The activity showed a disabled person sharing her personal journey. Perhaps Lincoln was excited to see photos of Ms. Polnac at an Astros game in April 2024, hoping that it demonstrated her ability to work full-time. Here are those photos:




35. The Policy does not prohibit an insured from being a fan of the two-time World Series Champion Houston Astros, surgical scars and all. In short, the CoventBridge investigation only provided additional evidence that Ms. Polnac is disabled. Lincoln's perverted interpretation showed its single-pointed desire to deny her claim, no matter what the evidence.

36. Lincoln terminated Ms. Polnac's LTD claim on June 18, 2025, contending that it did not get any medical records for April-September 2025, a point two months into the future.

37. The Policy's definition of disability changed from "own occupation" to "any occupation" on September 11, 2025.

Ms. Polnac's Appeal

38. Ms. Polnac hired undersigned counsel to assist her with the claim. Undersigned counsel submitted an appeal to Lincoln on November 18, 2025, along with 20 appeal exhibits. The additional evidence demonstrated that Ms. Polnac's pain, medication side effects, and combined effects of her health conditions, still prevented her from working as a Surgical Tech at Memorial Hermann. The additional evidence, including a recent Functional Capacity Examination, also demonstrated that she was unable to work in any occupation for which she is qualified by education, training, or experience. The appeal noted that Lincoln was acting in bad faith by ignoring the medical records that were submitted in this claim. It also committed other misconduct that underscored its desire to deny this claim, no matter what the evidence.

39. To ensure that all of Ms. Polnac's appeal arguments are preserved, the appeal letter is attached as *Exhibit 1*. They are fully incorporated into this Complaint.

Lincoln Fails to Timely Decide Appeal

40. Undersigned counsel faxed the appeal letter and all 20 appeal exhibits on November 18, 2025 at 10:09 a.m. The fax did not go through.

41. A paper copy of the appeal was mailed, along with the appeal exhibits on USB drive.

42. On December 2, 2025, Lincoln employee Katrina "D." (phone number 888-437-7611, ext. 66955) left a message with undersigned counsel that Lincoln received the appeal letter and all 20 appeal exhibits.

43. ERISA requires that a decision be made within 45 days, unless the plan administrator determines that special circumstances require an extension of time. 29 C.F.R. §2560.503-1(f)(4). There is nothing "special" or "beyond the control of the plan" about conducting an expeditious review. *See Salisbury v. Prudential Ins. Co. of Am.*, 238 F. Supp. 3d 444, 449–50 (S.D.N.Y. 2017) (the need to conduct a medical or vocational review, nor the existence of a lengthy claim file, cannot constitute "special circumstances" warranting an extension of the appeal deadline mandated by ERISA). *See also Satter v. Aetna Life Ins. Co.*, No. 3:16-CV-1342 (AWT), 2019 WL 2896410, at *6 (D. Conn. Mar. 20, 2019) ("Failure to appoint a reviewing doctor in a timely manner is not a 'special circumstance' under 29 C.F.R. § 2560.503-1(i)(1)(ii)").

44. Claim administrators must "strictly adhere" to all claim handling requirements set forth in 29 C.F.R. § 2560.503-1. The failure to do so immediately results in the claim being denied by operation of law, with the claimant being deemed to have exhausted his administrative remedies and entitled to file suit in federal court. 29 C.F.R. §2560.503-1(l)(2).

45. In *McQuillin v. Hartford Life & Accident Ins. Co.*, 2022 WL 2029879 (2nd Cir. Jun. 7, 2022), the Second Circuit upheld ERISA's strict time limits to decide an appeal. After Hartford failed to timely decide an appeal, Mr. McQuillan filed suit on day 46. The Second Circuit agreed with Mr. McQuillin, supported by the United States Department of Labor as *amicus curiae*, that his administrative remedies were deemed exhausted because Hartford, in violation of the applicable ERISA regulation, failed to provide a final decision on his benefits within 45 days of his administrative appeal. The Court pointed out that ERISA was designed with the

dual purposes of "ensuring fair and prompt enforcement of rights" under ERISA plans and encouraging the formation of such plans in the first place.

46. By January 28, 2026, 57 days had since Ms. Polnac sent all of her evidence to Lincoln and Lincoln confirmed receipt of that evidence. Just as in *McQuillan*, Lincoln has failed to decide the appeal. It is deemed denied.

47. Ms. Polnac filed her Original Complaint on January 28, 2026.

48. On February 6, 2026, Lincoln mailed a letter to undersigned counsel.

49. Four days later, undersigned counsel had a phone call with Lincoln employee Phyllis Muex. Ms. Muex advised that Lincoln had partially overturned its denial of the claim and partially upheld its denial. She emailed the letter to undersigned counsel the same day.

50. In Lincoln's letter dated February 6, 2026, it approved LTD benefits from June 27, 2025 through September 10, 2025. It still denied benefits after that time, contending that Ms. Polnac was able to work in four other occupations.

51. Lincoln's letter is confusing and illogical. It claimed that Ms. Polnac could appeal its newest denial. However, it claimed she was not disabled after August 22, 2024:

> Under Employee Retirement Income Security Act (ERISA) appeal guidelines, you are entitled to appeal the decision made by Lincoln Financial Group, and to submit any additional information you wish to be considered as part of the appeal. Lincoln Financial Group has conducted a full and fair review of your appeal and accompanying materials and has concluded a denial of benefits beyond August 22, 2024.

52. Lincoln's February 6, 2026 decision was after the 45-day decision deadline.

53. Lincoln did not identify any "special circumstances" for its late decision.

54. Her claim after September 10, 2025 remains deemed denied.

55. Having exhausted her administrative remedies, Donna Polnac brings this action to recover the LTD benefits promised in the Plan and Policy.

**Causes of Action**

56. The Memorial Hermann Health System Plan ("Plan") is governed by ERISA. 29 U.S.C. §1001, *et. seq*. Memorial Hermann is the plan sponsor and Plan Administrator. Lincoln is the insurer, Claims Administrator, and a named fiduciary under the Plan.

57. As Plan fiduciary, Lincoln is obligated to handle claims for the benefit of the Plan and Plan beneficiaries, and to deliver the benefits promised in the Plan. It is also obligated as a fiduciary to conduct its investigation of a claim in a fair, objective and even-handed manner.

58. Lincoln's adjustment or "adjudication" of Ms. Polnac's claim was instead biased and outcome oriented. This was in part reflected by its termination of her claim, even after being presented with evidence of her disability. It was reflected in Lincoln's unreasonable decision to completely ignore Ms. Polnac's treating physicians in favor of biased and unqualified paid medical reviewers.

59. Lincoln's interpretation of the Plan and the terms of the Plan was not legally correct. It was also contrary to a plain reading of the Plan language.

60. Lincoln's interpretation of the Plan and Plan language was contrary to that of the average Plan participant and policyholder. It was contrary to the common and ordinary usage of the Plan terms. Alternatively, the Policy language upon which Lincoln based its denial decision was ambiguous. The ambiguous terms must be construed against Lincoln and in favor of coverage for Ms. Polnac.

61. Lincoln's denial was made without substantial supporting evidence. Its decision to terminate Ms. Polnac's claim was instead based upon rank speculation and guesswork, especially when it decided that she would not be disabled two months into the future of its decision. Lincoln's denial decision was *de novo* wrong. Alternatively, it was arbitrary and capricious.

62. The decision-making process did not comport with 29 U.S.C. §1133's requirement that any notice of the denial must contain the specific reasons for such denial, written in a manner calculated to be understood by the participant, and must comport with the Department of Labor Regulations.

63. The decision-making process did not provide a reasonable opportunity to Ms. Polnac for a full and fair review of the decision denying the claim, as is required by 29 U.S.C. §1133 and 29 C.F.R. 2560.503-1.

64. The appellate procedures did not provide Ms. Polnac with a full and fair review. Given Lincoln's lack of timely action, it has not provided any review at all.

65. Lincoln did not provide a written explanation of any special circumstances pursuant to 29 C.F.R. §2560.503-1(f)(4) that would justify its delayed decision.

66. Due to Lincoln's lack of timely action, the appellate procedures have been rendered moot.

67. At all material times, Lincoln was acting on behalf of the Plan and in its own capacity as the Insurer and Claims Administrator.

68. Lincoln's denial of Ms. Polnac's claim breached the Plan terms. This breach violated 29 U.S.C. §1132(a)(1), entitling Ms. Polnac to the LTD policy benefits to which she is entitled under the Plan, along with pre-judgment interest on the amounts due and unpaid, all for which she now sues.

## Standard of Review

69. The default standard of review for denial of a benefit claim is *de novo*. Where the Plan or Policy confers discretion on the Claims Administrator, an abuse of discretion standard of review may apply.

70. The Plan or Policy may contain a discretionary clause or language Lincoln may construe as giving it discretion to determine eligibility for benefits, interpret the terms of the Policy, and determine the facts. Its denial under this standard of review, if any, was an abuse of discretion. It was arbitrary and capricious.

71. Alternatively, the standard of review of this claim should be *de novo,* affording Lincoln no discretion in their interpretation of the terms of the Policy and Plan or in its factual determinations. Both factual conclusions and legal determinations are reviewed *de novo* by the Court. *Ariana v. Humana Health Plan of Texas, Inc.*, 884 F.3d 246 (5th Cir. 2018).

72. The Plan or Policy was delivered in Texas and is subject to Texas law. Accordingly, Texas law applies under the ERISA savings clause. Texas has banned the use of discretionary clauses in insurance policies issued in this state. TEX. INS. CODE §1701.062; 28 Tex. ADMIN. CODE §3.1202. Accordingly, review of Ms. Polnac's claim and Lincoln claims handling conduct, both in its Policy and the Plan term interpretation, and in its factual determinations, should be *de novo*.

73. Just as in *McQuillin v. Hartford Life & Accident Ins. Co.*, 2022 WL 2029879 (2nd Cir. Jun. 7, 2022), this Court should uphold ERISA's strict time limits to decide a claim. The Second Circuit agreed with Mr. McQuillin, supported by the United States Department of Labor as amicus curiae, that his administrative remedies were deemed exhausted because Hartford, in violation of the applicable ERISA

regulation, failed to provide a final decision on his benefits within 45 days of his administrative appeal.

74. Here, Lincoln has failed to make any decision on the appeal 57 days after it acknowledged receiving it. The claim has been deemed exhausted, and no additional evidence, post hoc rationale, or other manufactured justification by Lincoln should be permitted at this point. Specifically, any evidence that Lincoln generated between January 28, 2026 and the present in this claim is prohibited from inclusion in the ERISA Record.

**Request for Prejudgment Interest**

75. Ms. Polnac requests, in addition to the benefits withheld, prejudgment interest on any such award. She is entitled to prejudgment interest as additional compensation, and pursuant to Texas Insurance Code, Sec. 1103.104, or on principles of equity.

76. The Plan and Policy do not contain a rate of interest payable on the benefit amount wrongfully withheld. Resort must be had to Texas Insurance Code Sec. 1103.104(c).

77. ERISA plaintiffs are authorized to obtain prejudgment interest when calculating the total compensation amount for their claims. *Perez v. Bruister*, 823 F.3d 250, 274 (5th Cir. 2016) ("Prejudgment interest is available in ERISA cases."); *Whitfield v. Lindemann*, 853 F.2d 1298, 1306 (5th Cir. 1988) ("It is not awarded as a penalty, but of as compensation for use of the funds."). Prejudgment interest furthers ERISA's purpose. *City Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, (1995) (The "essential rationale for awarding pre-judgment interest is to ensure that an injured party is fully compensated for its loss.").

78. Because ERISA does not mandate a rate for prejudgment interest, state law determines the applicable interest rate. *Perez v. Bruister*, 823 F.3d 250, 274 (5th Cir. 2016). In the alternative to the Texas Insurance Code, prejudgment interest may be calculated under Texas Finance Code Ch. 304. *Arete Partners, LP v. Gunnerman*, 643 F.3d 410, 414-15, (5th Cir. 2011). Accrual of interest starts on (1) the 180th day after a defendant receives written notice of claim or (2) the date suit is filed, whichever is earlier. Tex. Fin. Code Ann. §304.003(c), 304.104. Accrual of interest ends on the day preceding the judgment, at the prime rate of 5% per year if the prime rate is less than 5%. *Id.*

79. More recent ERISA caselaw concludes that 8% interest is an appropriate interest rate. *Dwyer v. UnitedHealthcare Ins. Co.*, No. A-17-CV-439-RP, 2026 WL 184247 (W.D. Tex. Jan. 21, 2026) (Magistrate Judge Mark Lane).

**Claim for Attorneys' Fees and Costs**

80. Ms. Polnac seeks an award of her reasonable attorneys' fees incurred and to be incurred in the prosecution of this claim for benefits. She is entitled to recover those fees, together with her costs of court, pursuant to 29 U.S.C. §1132(g).

81. The court may award attorneys' fees when it "can fairly call the outcome of the litigation some success on the merits without conducting a lengthy inquiry". *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255 (2010).

82. It is well established that where there is a significant delay between the time legal services are rendered and an award of fees, a district court can either award a delay enhancement or make the award on current market rates. *Humphrey v. United Way of Texas Gulf Coast*, 802 F. Supp. 2d 847, 863 (S.D. Tex. 2011) (citing

*Missouri v. Jenkins*, 491 U.S. 274, 284 (1989)). Ms. Polnac reserves the right to seek a delay enhancement or future award on then-current market fee rates.

**Request for Relief**

Donna Polnac, Plaintiff, respectfully prays that upon trial of this matter or other final disposition, this Court find in her favor and against Defendant, and issue judgment against Defendant as follows:

A. Pay to Ms. Polnac all benefits due and owing in accordance with the terms of the Plan and Policy, as well as all prejudgment interest due thereon and as allowed by law and equitable principles;

B. Pay all reasonable attorneys' fees incurred and to be incurred by Ms. Polnac in obtaining the relief sought herein, along with the costs associated with the prosecution of this matter; and

C. All such other relief, whether at law or in equity, to which Ms. Polnac may show herself justly entitled.

Respectfully submitted,

By:______________________________

Amar Raval, TBA #24046682
S.D. No. 619209
RAVAL TRIAL LAW
1133 Merrill St.
Houston, TX 77009
(713) 324-8118
amar@ravaltriallaw.com

ATTORNEYS FOR PLAINTIFF